## FORBES *v.* GRACEY.

1. Although the title to mineral lands may remain in the United States, tne ores, when dug or detached from the lands under a mining claim, are free from any lien, claim, or title of the United States, and, becoming personal property, are, as such, subject to State taxation in like manner as other personal property.

2. The words "mines or mining claims" in the sixth section of the act of the legislature of Nevada of Feb. 28, 1871, imposing a tax upon such ores, and making it "a lien on the mines or mining claims from which the ores or minerals bearing gold or silver are extracted for reduction," were evidently intended to distinguish between cases in which the miner is the owner of the soil, and therefore has a perfect title to the mine, and those in which he works under a mining claim, the title to the land remaining in the United States. In the first case, the tax is a valid lien on the mine itself; but in the second, only upon his possessory right, under existing laws and regulations, to work and explore the mine.

8. Such a claim is property in the fullest sense of the word. It is subject to a lien for taxes, and may be sold for the non-payment of them, without infringing the title of the United States.

APPEAL from the Circuit Court of the United States for the District of Nevada.

The case is stated in the opinion of the court.

Submitted on printed arguments by *Mr. Hall McAllister* for the appellant, and by *Mr. W. E. F. Deal* for the appellee.

MR. JUSTICE MILLER delivered the opinion of the court.

This was a suit brought by appellant to enjoin the collector of taxes for Story County, Nevada, from collecting a tax imposed by the law of that State upon the property of the Consolidated Virginia Mining Company, the appellant being a stockholder in the company and an alien subject of the Queen of Great Britain. The tax is, by the State statute, imposed upon the proceeds of the mine worked by the corporation, and is resisted on the ground that the title to the land from which

the mineral is taken is in the United States, and is not for that reason liable to State taxation.

The case is prepared and submitted to us on printed arguments in the very last days of the term, and we are urged to decide it on the ground that it involves a question of vast interest to all the mining operations in the Pacific States, and is of vital importance to the State of Nevada, as it affects her largest source of revenue. In view of its importance we should postpone the decision until next term, if the questions presented were either doubtful or difficult of solution. We think a very few words — all we can give to the subject at this late day — will show that it is neither.

It is very true that Congress has, by statutes and by tacit consent, permitted individuals and corporations to dig out and convert to their own use the ores containing the precious metals which are found in the lands belonging to the government, without exacting or receiving any compensation for those ores, and without requiring the miner to buy or pay for the land. It has gone further, and recognized the possessory rights of these miners, as ascertained among themselves by the rules which have become the laws of the mining districts as regards mining claims. See Revised Statutes, title xxxii. chap. 6, sects. 2318–2352. But in doing this it has not parted with the title to the land, except in cases where the land has been sold in accordance with the provisions of the law on that subject. If the tax of the State of Nevada is, in point of fact, levied on this property-right of the United States, we are bound by our previous decisions and by sound principle to hold that it is void. If, on the other hand, it is levied on property of the miner, and may be collected without affecting or embarrassing the title of the United States to property which belongs to that government, then there is no ground for interference with the processes of the State in its collection. A few extracts from the statute of Nevada, showing the nature and character of the property on which the contested tax is imposed, and the manner of its enforcement and collection, will enable us to decide whether it belongs to the one or the other of these classes. We copy here the important sections of the act of Feb. 28, 1871, imposing this tax: —

"SECTION 1. All ores, tailings, and mineral-bearing material of whatever character shall be assessed for purposes of taxation for State and county purposes in the following manner: From the gross yield, return, or value of all ores, tailings, or mineral-bearing material of whatever character, there shall be deducted the actual cost of extracting said ores as minerals from the mine, the actual cost of saving said tailings, the actual cost of transportation of said ores, mineral-bearing material, or tailings to the place of reduction or sale, and the actual cost of such reduction or sale, and the remainder shall be deemed the net proceeds, and shall be assessed and taxed as provided for in this act: *Provided,* that in no case whatsoever shall the whole amount of deductions allowed to be made in this section from the gross yield, return, or value of said ore, mineral-bearing material, or tailings exceed the percentage of gross yield, value, or return of such ore, mineral, or tailings, as hereinafter specified; on all ores, tailings, or mineral-bearing material the gross yield or value of which is $12 per ton or less, the whole amount of deductions shall not exceed ninety per cent of such gross yield, return, or value; on all ores, tailings, or mineral-bearing material, the gross yield, value, or returns of which is over $12 and under $30 per ton, the whole amount of deductions shall not exceed eighty per cent of such gross yield, value, or return; on all ores, tailings, or mineral-bearing material, the gross yield, return, or value of which is over $30 and less than $100 per ton, the whole amount of deductions shall not exceed sixty per cent of such gross yield, value, or return; on all ores, tailings, or mineral-bearing material, the gross yield, return, or value of which is $100 per ton or over, the whole amount of deductions shall not exceed fifty per cent of such gross yield, return, or value: *Provided,* that an additional exemption of $15 per ton may be allowed on all ores, tailings, or minerals worked by the Freiburg process.

"SECT. 2. It shall be the duty of the several county assessors within this State to compare and complete quarterly, on or before the second Monday in February, May, August, and November, in each year, a tax list or assessment roll of the proceeds of the mines, alphabetically arranged, in a book furnished them by the board of county commissioners for that purpose, in which book shall be listed or assessed the proceeds of all mines in their respective counties, as provided in this act."

"SECT. 6. Every tax levied under the authority or provision of this act on the proceeds of the mines is hereby made a lien on the mines or mining claims from which ores or minerals bearing gold

or silver, or either or any other valuable metal, is extracted for re-
duction, which lien shall attach on the first days of January, April,
July, and October of each year, for the quarter year commencing
on those days respectively; and shall not be satisfied or removed
until the taxes, as provided in this act, on the proceeds of the mines,
are all paid, or the title to said mines or mining claim is absolutely
vested in a purchaser, under a sale for the taxes levied on the pro-
ceeds of such mines or mining claims."

"SECT. 10. The collection of the tax authorized to be levied
under this act shall be enforced in the same manner in which the
tax on any other kind of personal property is enforced and col-
lected."

What is this manner of enforcement is to be found in sect.
110 of a previous statute, which reads as follows: —

"At any time while the assessment roll of any quarter is in the
hands of the assessor for collection, the assessor may seize upon the
personal property, or so much thereof as may be sufficient to satisfy
the taxes and costs, of any person, firm, corporation, association, or
company who shall neglect or refuse to pay such taxes for one week
after such demand of the assessor or his deputy, and shall post a
notice of such seizure, with a description of the property, and the
time and place whereon it will be sold, in three public places in the
township or precinct where it is seized, and shall, at the expiration
of five days, proceed to sell at public auction, at the time and place
mentioned in the notice, to the highest bidder for cash, a sufficient
quantity of such property to pay the taxes and costs incurred."

From the first section of the statute we ascertain what it is
that is taxed; namely, all the ores, tailings, or mineral-bearing
material of whatever character, after deducting the actual cost
of extracting said ores as mineral from the mines, and other
expenses, such as transporting them to the place of reduction, &c.

From this it is clear that it is the ore after it has been sepa-
rated from the bed in which it is found, and its proceeds and
products, which are taxed, and not the ore or mineral in the
earth. Indeed, this latter idea is not advanced by any one, and
it would be preposterous.

As we construe the statutes of the United States and the
recognized rule of the government on this subject, the moment
this ore becomes detached from the soil in which it is embedded
it becomes personal property, the ownership of which is in the

man whose labor, capital, and skill has discovered and developed the mine and extracted the ore or other mineral product. It is then free from any lien, claim, or title of the United States, and is rightfully subject to taxation by the State as any other personal property is.

The truth of this proposition is too obvious to need or admit of illustration or elaboration, and, as we have already said, the pressure of business does not admit of it.

In regard to the taxing of this personal property, and the mode of collecting it by sale as provided in the section last cited, it does not seem to us that there can be any reasonable ground for asserting that the United States has any interest in the tax or in the sale of the property taxed. It is, however, urged with more show of reason that sect. 6, which makes this tax " a lien on the mines or mining claims from which the ores or minerals bearing gold or silver are extracted for reduction," is an interference with the right of property of the government in the lands in which the mineral remains are extracted.

An examination of the language we have quoted will show that it was carefully prepared to avoid this objection, and we think it does.

The use of the words " mines or mining claims " is evidently intended to distinguish between the cases in which the miner is the owner of the soil, and therefore has perfect title to the mine, and those in which the miner does not have title to the soil, but works the mine under what is well known in the mining districts, and what is, as we have said, recognized by the act of Congress, as a mining claim. In the first case, the statute makes the tax a lien on the mine, because the title to the mine is in the person who owes and should pay the tax. In the other, the tax is a lien only on the claim of the miner; that is, on his possessory right to explore and work the mine under the existing laws and regulations on the subject.

In the former case, of course, the United States has no interest to be protected, and the State is at liberty to declare and enforce such a lien for her taxes. In the latter, also, such right as the mining laws allow and as Congress concedes to develop and work the mines, is property in the miner, and

property of great value. That it is so, is shown most clearly by the conduct of the mining corporation in whose interest this suit is brought, which, for the purpose of evading this tax, permits its investment in this mine, said to be worth from fifty to a hundred millions of dollars, to rest on this claim, this mere possessory right, when it could, at a ridiculously small sum compared to the value of the mine, obtain the government's title to the entire land, soil, mineral, and all. Those claims are the subject of bargain and sale, and constitute very largely the wealth of the Pacific coast States. They are property in the fullest sense of the word, and their ownership, transfer, and use are governed by a well-defined code or codes of law, and are recognized by the States and the Federal government. This claim may be sold, transferred, mortgaged, and inherited, without infringing the title of the United States. Why may it not also be made subject to a lien for taxes, and the claim, such as it is, recognized by statute, be sold to enforce the lien? We see nothing in principle or in any interest which the United States has in the land to prevent it.

We are of opinion that the decree of the Circuit Court dismissing the bill of appellant on demurrer was right. It is, therefore,　　　　　　　　　　　　　　　　　*Affirmed.*

MR. JUSTICE FIELD took no part in the decision of this case.